UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 24-cr-502 (DLF) |
| | : | |
| LAMAAS LOWERY-BEY, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Defendant possessed an illegal firearm, a .40 caliber Glock semi-automatic handgun with an extended magazine and has previously been convicted of Attempted Assault with a Firearm, Unlawful Possession of a Firearm (Prior Conviction Exceeding One Year), and Contempt. For the reasons stated herein, the Government respectfully requests that the Court sentence the Defendant to a Guidelines sentence of 78 months of imprisonment, followed by three years of supervised release.

**BACKGROUND**

The Government's investigation into the Defendant began as part of a broader investigation by the Federal Bureau of Investigations ("FBI") into the Fairlawn community of Southeast D.C. Fairlawn—bordered by 295, Pennsylvania Ave, Minnesota Ave and Naylor Road—experienced the highest rates of gun violence in Washington D.C. in the summer of 2023. Between February and October 2023, five homicides occurred in the Fairlawn neighborhood. As part of these investigations, law enforcement focused their efforts in and around the area of 19th Street SE and Minnesota Ave SE. On September 14, 2023, through a surveillance camera affixed to a utility pole, the Defendant was observed standing in the walkway in front of 1911 18th Street SE pulling a black semi-automatic handgun out of the front of his pants. While pulling the gun out, the

Defendant had in his hands a bag of green leafy substance. From the way the Defendant held the gun, it appeared as though the gun had an extended magazine.



On October 4, 2023, MPD officers executed a D.C. Superior Court search warrant at the residence of the Defendant in Southeast D.C. While searching the bathroom adjoined to the Defendant's bedroom, officers recovered a .40 caliber Glock semi-automatic handgun with an extended magazine loaded with 29 rounds of ammunition in a 30-round capacity magazine. The gun was hidden in a precarious location, behind a canvas painting hung above the toilet. As officers removed the canvas from the wall, the loaded firearm came crashing down onto the tank of the toilet.



The Defendant's DNA was compared to swabs from the firearm and the DNA profile on the gun is 1.5 quadrillion times more probable if the sample originated from the Defendant and

one unknown person than if it originated from two unknown persons.



A check through law enforcement databases revealed that the gun was reported stolen. The firearm was also equipped with a "switch". When it was test-fired by law enforcement, the "switch" was inoperable. Had the "switch" been operable, it would have converted this firearm into a fully automatic machinegun, meaning that it would have expended all of the ammunition in its 30-round extended magazine with one pull of the trigger.

In addition to possessing the illegal Glock semi-automatic handgun seen above, a search of the Defendant's two cell phones reveals the Defendant's narcotics trafficking and probable possession of numerous other firearms. The Defendant's two phones' photo libraries included images of large quantities of marijuana, often photographed atop digital scales or with large amounts of cash, suggesting the Defendant was involved in its trafficking and distribution. A selection of these images, created between April 2023 and March 2024, are pictured below.

       

    

Additionally, the Defendant's phones contained numerous photos of various firearms, including a photo dated September 13 (the day before the Defendant is seen on surveillance displaying a firearm from his waistband) of a firearm on his lap that closely resembles the recovered firearm.



    



Prior to his arrest in this instant case, the Defendant was arrested on June 17, 2023, for unlawful possession of a firearm. Officers recovered a 9mm Taurus Millennium handgun with 18 rounds in an extended magazine and one round in the chamber, along with a 50-round drum magazine and several bags of marijuana by the Defendant. The Defendant was charged in Superior Court but ultimately dismissed.



Messages extracted from the Defendant's cell phones also corroborate his distribution of marijuana. For instance, on September 9, 2023, he responds to a buyer that he sells a "zip" of marijuana for $175.





On September 14, 2024—the same day the Defendant was observed on surveillance possessing a firearm—the defendant discussed selling marijuana. The Defendant confirmed through his text that he is "out here every day" at 1911 18th Street SE selling marijuana.

**Direction:** Outgoing
**Body:** But Ima have it bro just give me some lil time bruh I still got weed
**Participants:**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| + [redacted] | 9/14/2023 4:09:45 PM(UTC+0) | | |

Source Extraction: Legacy-GrayKey AFU
Service Identifier:
Status: Sent
Message Type: iMessage
Folder: Sent

**Direction:** Outgoing
**Body:** That's cuss my shit be down stairs some body out here salting my weed down or something bruh no funni
**Participants:**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| + [redacted] | 9/14/2023 4:10:20 PM(UTC+0) | | |

Source Extraction: Legacy-GrayKey AFU
Service Identifier:
Status: Sent
Message Type: iMessage
Folder: Sent

**Direction:** Outgoing
**Body:** Thin every body got weed tryna rush the sales in shit bruh I'm out here now tho
**Participants:**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| + [redacted] | 9/14/2023 4:10:43 PM(UTC+0) | | |

Source Extraction: Legacy-GrayKey AFU
Service Identifier:
Status: Sent
Message Type: iMessage
Folder: Sent

**Direction:** Outgoing
**Body:** I'm we at 290
**Participants:**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| + [redacted] | 9/14/2023 4:11:51 PM(UTC+0) | | |

Source Extraction: Legacy-GrayKey AFU
Service Identifier:
Status: Sent
Message Type: iMessage
Folder: Sent

**Direction:** Outgoing
**Body:** I'm out here every day
**Participants:**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| + [redacted] | 9/6/2023 12:09:08 PM(UTC+0) | | |

Source Extraction: Legacy-GrayKey AFU
Service Identifier:
Status: Sent
Message Type: iMessage
Folder: Sent

**Direction:** Incoming
**Body:** Send a addy then I'll send some to show my shit lands and it's really money on this side
**Participants:**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| wbig97@icloud.com | | 9/6/2023 7:27:34 PM(UTC+0) | |

Source Extraction: Legacy-GrayKey AFU
Service Identifier:
Status: Read
Message Type: iMessage
Folder: Inbox

**Direction:** Outgoing
**Body:** 1911 18th street southeast
**Participants:**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +14244139360 | 9/6/2023 7:28:31 PM(UTC+0) | | |

Source Extraction: Legacy-GrayKey AFU
Service Identifier:
Status: Sent
Message Type: iMessage
Folder: Sent



On May 26, 2024, MPD officer searched vacant unit B-4 in 1907 18th Street SE and recovered three firearms (with one gun containing a "giggle" switch converting it to a fully automatic machinegun) and 1.6 pounds of marijuana. There was only one cell phone found in the vacant unit where the marijuana and guns were stored, and that was a cell phone belonging to the Defendant.



Two days prior to the recovery of the three firearms and marijuana from the vacant unit, the Defendant was observed on camera putting a gun into his waistband.



While the defendant pleaded guilty to unlawful possession of a firearm by a felon for his possession of a firearm on October 4, 2023, a court-authorized search of the Defendant's phone seized from him during his arrest on November 8, 2024, shows that he again on July 28, 2024, possessed a firearm, despite his felon status. Indeed, there is ample evidence that the Defendant's unlawful possession was not a one-time mistake, rather, he repeatedly and persistently possessed firearms as a felon.



Finally, since FBI began its investigation around March 2024, the Defendant has been observed on surveillance camera frequently outside of 1911 and 1907 18th Street SE engaging in what appears to be hand-to-hand transactions. For instance, on October 25, 2024, at approximately 1:24 PM, the Defendant exited 1907 18th Street SE with a large white paper bag. Shortly thereafter, he pulled a smaller plastic bag from the white bag and then approached a black female on the sidewalk in front of 1907 18th Street SE. The Defendant appeared to hand the black female something who then departed the area shortly thereafter. Later that same day, at approximately 1:49 PM, while holding the smaller plastic bag, he removed a small item and conducted a brief hand to hand exchange with an unknown black male who then departed the area shortly thereafter. Just prior to his arrest on October 31, 2024, at approximately 12:42 PM, an unknown black male approached a group of individuals in front of 1907 18th Street. The Defendant conducted a brief hand to hand transaction with the unknown black male who then departed the area.

## PROCEDURAL HISTORY

On November 7, 2024, the Defendant was indicted by a federal Grand Jury for one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1) and one count of possession pf a firearm by a person convicted of a crime punishable by a term of one year or more in violation of D.C. Code § 22-4503. On November 8, 2024, Defendant was arrested by law enforcement officers at his residence. The Defendant made his initial appearance before the Honorable Matthew J. Sharbaugh, who set a detention hearing for November 13, 2024, pursuant to the Government's request for detention under 18 U.S.C. § 3142(f)(1)(E). The Defendant has been held since his arrest.

## SENTENCING GUIDELINES

The Government concurs with the Pre-Sentence Report [ECF No. 25] ("PSR") calculation that the Defendant's base offense level is 20, with a two-point enhancement for stolen firearm, and a three-point enhancement for possessing the firearm in connection with another felony offense, and that the Defendant accepted responsibility early enough in the case so as to qualify for a three-point reduction to his offense level. PSR at ¶¶ 23-32. The Government also concurs that the Defendant is not eligible for a zero-point offender adjustment. PSR at ¶¶ 33. Thus, based upon the final PSR released on July 17, 2025, the resultant total offense level of 23, along with a Criminal History Category of IV, results in a corresponding range of imprisonment under the Guidelines of 70 months to 87 months. The parties' criminal history score calculations missed the Anne Arundel County, Maryland credit card charge and the resultant one point. Accordingly, because the correct criminal history score is seven (and not six), one additional point is added pursuant to USSG §4A1.1(e) because the Defendant committed the instant offense while under supervision.

## LEGAL STANDARDS

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 551 U.S. 338, 348-50 (2007). The Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the

public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5) any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See Gall*, 128 S. Ct. at 598 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 338; *see also* United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 438 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." *Booker*, 543 U.S. at 264 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## ARGUMENT

A sentence of 78 months of incarceration followed by 3 years of supervised release in this case is appropriate given the repeated and brazen possession of firearms and its connection with marijuana distribution. The Government's recommended sentence is also intended to deter others, promote respect for the law, and offer rehabilitation for the Defendant.

1.  **The Nature, Circumstances, and Seriousness of the Offense**

Although "possessory" gun offenses are often perceived to be "minor" ones, they are anything but. As the Court is well aware, our community in recent years has faced staggering levels of gun violence. D.C. saw over 274 homicides in 2023 (the year this instant offense was committed), the highest level in 20 years. *See* MPD, *District Crime Data at a Glance*.[1] About 86 percent of the 274 homicides in 2023 involved the use of a firearm. *See* MPD, *Annual Report 2023*, 37.[2] Moreover, many shootings in this community are driven, at least in part, by the drug trade. Thus, merely possessing a firearm—especially in relation to a drug trafficking crime—is serious. After all, all instances of gun violence are also instances of gun possession.

---

[1] https://mpdc.dc.gov/node/197622

[2] https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/Annual%20Report%202023_READER_lowres.pdf

Here, while the Defendant is presently charged with only a firearm offense, there is evidence to believe the Defendant's illegal possession of a firearm is in furtherance of drug trafficking, namely the large quantity of marijuana distribution. The Defendant was observed on video just a few weeks before the recovery of the firearm in this case, brandishing the same firearm while holding a distributable amount of marijuana. As outlined above, in June 2023—a few months before the charged offense—the Defendant was stopped with both marijuana and a firearm. The Defendant's own text messages establish that he consistently sells marijuana in the Fairlawn neighborhood and photos of guns on his lap coincide with the same general period of time that he was trafficking marijuana. Indeed, the Defendant admitted as much in the Statement of Offense [ECF 21].

In addition to the single recovered firearm, there is abundant evidence that the Defendant possessed multiple firearms spanning a lengthy time period following his first felony conviction in 2017 as evidenced by photos of other guns that appear to be on the Defendant's lap, recoveries of guns from his person and in a vacant unit where he left his cell phone. Moreover, the circumstances surrounding the Defendant's charged gun possession establish that it was not an isolated occurrence nor locked away. The same gun that was recovered on October 4, 2023, matches the same gun that the Defendant displayed from his waistband on September 14, 2023, suggesting that the Defendant's possession was continuous. The gun's temporary hiding spot behind a canvas art suggests that the gun was intended to be carried on his person rather than locked away somewhere secure.

The Defendant's blatant disregard for the law to continue to possess firearms not only demonstrates his contempt towards the law and Court orders but also contributes to the gun violence plaguing this community. Thus, the seriousness of the Defendant's conduct merits the

Government's requested sentence.

    2.    **The Defendant's History and Characteristics**

The defendant's criminal history is concerning and demonstrates a pattern of escalating behavior, from possessing firearms to the use of a firearm. As outlined in the PSR, ¶ 40, the Defendant's previous conviction for attempted assault with a dangerous weapon (gun), possession of a firearm (prior conviction), and felony contempt stems from an act of domestic violence. On August 6, 2019, the Defendant threatened to shoot his girlfriend, her daughter, and the daughter's girlfriend. The victims asked the Defendant, who was just recently released from prison, to leave their apartment because it smelled like marijuana. This angered the Defendant and he pulled out a black handgun from a polka dot bag and racks the gun making a motion as if ready to fire the gun at the three women. Once officers arrived, the Defendant barricaded himself in the bathroom and did not surrender until about three hours later. Officers found a black Velocity 9mm semi-automatic firearm in the toilet, as if the Defendant attempted to flush it down the toilet. The polka dot bag was also found in the bathroom where the Defendant hid. According to the plea paperwork from the Superior Court case, the Defendant's contempt conviction arose from dozens of calls to the then-girlfriend witness, whom he was prohibited to have contact with.

Prior to this assault, on June 8, 2016, the Defendant was arrested and charged with Carrying Pistol Without a License. The Defendant fled from MPD officers and threw a silver handgun in the rear of 1733 T Street SE. The Defendant pleaded guilty on June 28, 2019 and was sentenced on February 28, 2020. See PSR, ¶ 38. Undeterred by his recent conviction, the Defendant's assault on his girlfriend described above occurred between the Defendant's guilty plea and sentencing.

Just two months prior to the gun arrest described above, on April 19, 2016, MPD officers observed the Defendant push a handgun under his left leg while sitting in the passenger's seat of

an idling white Mercedes.  A Tanfolglio 10mm semi-automatic handgun with seven rounds in the magazine and one round in the chamber was recovered from the vehicle.  See PSR, ¶ 37.  The Defendant was on release in this case when he was arrested less than two months later on June 8, 2016, for again carrying a firearm illegally.  Again, this April incident had no deterrent effect on the Defendant as he again armed himself with a firearm in June 2016.

Furthermore, the Defendant has a history of flouting court-mandated supervision.  When the Defendant possessed the .40 caliber Glock in September and October 2023 (the charged offense in this case), he was still on supervision following his incarceration in the assault case.  In other words, despite being on supervision following a conviction for threatening to shoot and kill his girlfriend and her daughter, the Defendant knowingly possessed a loaded firearm knowing he was a convicted felon and knowing he was on supervised release.  Aside from using his firearm to intimidate and threaten his romantic partner and minor children, he also carried his firearm on his person when distributing large amounts of marijuana.  Surveillance up to the date of his arrest in November 2024 showed a continued pattern of narcotics trafficking outside the 1900 block of 18th Street SE, the same general area where the five homicides occurred in the summer and fall of 2023.

In sum, the Defendant has had multiple serious felony convictions and served periods of incarceration, but as demonstrated in this instant case and his behavior surrounding the charged offense, prior sentences have proved ineffective at deterrence and rehabilitation.

### 3. The Need to Promote Respect for the Law and Deterrence

As noted above, the Defendant's conduct in this case occurred against the backdrop of historically high levels of violence in this city. Given the catastrophic impact of guns and drugs on our community, a high sentence in this case is warranted. Despite the *two* prior convictions for carrying a pistol without a license and the assault with a gun conviction, the Defendant remains

undeterred as he amassed more firearms leading to this instant offense. A sentence of 78 months of incarceration followed by 3 years of supervised release is necessary to address the Defendant's recidivism and promote respect for the law. After all, this is the Defendant's *fourth* gun conviction as an adult.

### 4. Other factors

As noted in the PSR, ¶ 130, the average length of imprisonment for a similarly situated defendant is 66 months and the median length is 70 months. Here, the Government's requested sentence is middle of the Guidelines at 78 months and only slightly above the median sentence. While the Government acknowledges the childhood challenges the Defendant faced, it appears the Defendant was afforded resources but "he did not engage with services". PSR ¶ 83. As an adult, the Defendant repeatedly chose to violate the same law he was convicted of, and chose to engage in drug trafficking as it was an easier (and more lucrative) way of living. Balancing the sentencing factors, the Government's recommended sentence considers the Defendant's conduct, his history and characteristics, the need for deterrence, and an opportunity for rehabilitation.

### CONCLUSION

The Defendant's conduct is serious and merits a commensurate sentence. For the foregoing reasons, the Government recommends that the Court sentence the Defendant to 78 months of incarceration followed by 3 years of supervised release. The Government also respectfully requests that the Court order forfeiture of the black Glock 23, .40 caliber handgun (S/N FKP597) and 29 rounds of .40 caliber ammunition, pursuant to the plea agreement.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: <u>*/s/ Iris Y. McCranie*</u>
IRIS Y. MCCRANIE
Assistant United States Attorney
NY Bar No. 5011234
601 D Street, NW
Washington, DC 20530
(202) 252-7828
Iris.mccranie@usdoj.gov